# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

MICHAEL HILL,

                       Plaintiff,

        vs.                           9:12-CV-202
                                      (LEK/ATB)

KAREN LAPOLT, *et al.*,

                       Defendants.

MICHAEL HILL, Plaintiff *pro se*
CHRISTOPHER W. HALL, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

    This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c).  Presently before the court are plaintiff's motion and defendants' cross-motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. Nos. 61 and 64).  Plaintiff has filed a reply. (Dkt. No. 67).  For the following reasons, this court agrees with the defendants and will recommend denying plaintiff's summary judgment motion and granting defendants' motion.

## I.   <u>Facts</u>

    Plaintiff brings this pro se civil rights complaint under § 1983 based on events arising out of his confinement at Great Meadow Correctional Facility ("Great Meadow C.F.").  In April 2011, plaintiff communicated with defendant Lapolt, Deputy Superintendent of Programs, regarding the restoration of good time.  (Dkt. No. 61-8 at 37, Dkt. No. 1-1 at 7).  Plaintiff complained that he was not being placed in the

programs that he needed to complete to have his good time restored. Plaintiff received a number of responses stating that he would not be placed in those particular programs until six to eight months before his earliest release date, and additionally that he could not be placed in these programs while on keeplock. Plaintiff filed grievances regarding these program issues in June and July of 2011. (Dkt. No. 1-1 at 19, 22).

A few months later, in September, plaintiff received a package of 50 cigars with an invoice dated September 13, 2011 that indicated a balance due of $5.00. (Dkt. No. 1-1 at 56). On September 14, 2011, plaintiff was told that he needed to return the package of cigars to the company and completed a disbursement form for $3.50 for the return shipping. (Dkt. No. 61-6 at 54). The amount was changed by defendant Weatherby[1] to $5.95–the amount needed to return the package. (*See* Dkt. No. 61-6 at 61). After plaintiff filed a grievance regarding this issue, on appeal the Central Office Review Committee ("CORC") found that the disbursement form should have been returned to plaintiff to change, noted that appropriate corrective action had been taken, and that plaintiff was reimbursed the $2.45 difference. (Dkt. No. 61-6 at 55). Plaintiff had an issue with a second package of cigars, which arrived indicating a $2.00 balance. Plaintiff did not complete the required form regarding disposal of the package because he believed that the company made a mistake by stating that he owed $2.00. Accordingly, the package was destroyed in accordance with Directive 4911. (*See* Dkt. No. 61-6 at 37).

---

[1] Plaintiff incorrectly refers to defendant Weatherby as "Weatherman.' The court will use defendant's correct name.

On September 20, 2011, plaintiff received a misbehavior report from a facility correctional teacher, defendant Spada. Defendant Spada found a note on one of plaintiff's assignments stating "check my folder, note there for you."[2] (Dkt. No. 61-6 at 79). As a result, defendant Spada filed a misbehavior report, charging plaintiff with harassment, stalking, and a correspondence violation. At the resulting hearing, over which defendant Lapolt presided, plaintiff was found guilty of harassment and stalking, but defendant Lapolt dismissed the correspondence violation.

During this same time period, plaintiff was having chest pains, and was seen on sick call a number of times. An EKG and a stress test were performed, he was diagnosed with gastrointestinal disease, and he was prescribed medication. He was seen by defendant Silverberg, the doctor at the facility at the end of September 2011 and in early February 2012.

Finally, plaintiff claims that he should have been receiving interest on funds in his inmate account, including "gate money." (*See* Dkt. No. 61-6 at 2). In response to plaintiff's questions, defendant Forbes, institutional steward, explained that interest is earned on all of an inmate's money, including "gate money," and that interest earned

---

[2] The note that defendant Spada found in the folder read: "I would like to keep this brief and simple as possible please try to understand in taking unnecessary risk, my vibe has been telling me one thing and my mind another, so if it is not going beyond proper conduct I would like to be sure that my mind is not playing tricks on me, some men in prison misinterprets a smile of friendly body language as something other than what it is, I don't wish to make this mistake and find myself in any trouble. As we know I am taking a major chance right now writing this. However I could never rest in peace not knowing, plus I believe in the old saying that goes 'closed mouths don't get feed'. So, what I really want to know is can I write you. Yes, no, as simple as that. I have not had a visit in over five years or mail from anyone other than family. Do you understand my predicament, enough to take a chance to be willing to help me know what is going on in the free world outside of this cell." (Dkt. No. 61-6 at 79-80)

is provided to inmates who qualify for interest, by having an average balance of $100 or more for a given quarter. (Dkt. No. 61-6 at 3, 6).

Liberally construed, plaintiff alleges that his constitutional rights under the First, Eighth, and Fourteenth Amendments were violated because: 1) he was denied adequate medical care; 2) he was denied due process at his disciplinary hearing; 3) defendants interfered with his mail; 4) he was denied access to the courts; 5) defendants retaliated against him for filing grievances; 6) defendants conspired to violate his constitutional rights; 7) interest he should have earned was not credited to him.[3]

## II.  **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts

---

[3]  The court has addressed all of the claims alleged in plaintiff's complaint, but has reorganized them for clarity.

by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

Where, as here, cross motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment." *Natural Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id.* (citation omitted). Moreover, "[t]he district court considering a summary judgment motion . . . must . . . be 'mindful of the underlying standards and burdens of proof . . .'" *U.S. S.E.C. v. Meltzer*, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (citations omitted). Accordingly, with respect to plaintiff's motion, he bears a much greater initial burden; he "must show that the evidence supporting [his] claims is so compelling that no reasonable jury could return a verdict for the defendant." *Id.* *Accord, McCarthy v. Wachovia Bank, N.A.*, 759 F. Supp. 2d 265, 273 (E.D.N.Y.

2011).

### III. __Denial of Medical Care__

#### A. __Legal Standard__

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia*, *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the

particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto*, 248 F. App'x at 236 (citing, *inter alia*, *Chance v. Armstrong* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* v. *Goord,* 467 F.3d at 281.

Even negligence in diagnosing or treating an inmate's medical condition does

not constitute deliberate indifference. *Farmer v. Brennan*, 511 U.S. at 835.

Therefore, any claims of medical malpractice, or disagreements with treatment are not

actionable under section 1983. *Ross v. Kelly*, 784 F. Supp. 35, 44-45 (W.D.N.Y.

1992), *aff'd* 970 F.2d 896 (2d Cir. 1992) (table).

## B.    Application

Plaintiff accuses defendants Silverberg, Lindstrand, and Racette of deliberate

indifference to plaintiff's serious medical needs.  (Dkt. No. 64-3 ("Hill Dep.") at

112).[4]  That claim is based upon the delay in providing him treatment.  Plaintiff has

attached to his complaint and to his summary judgment motion, a variety of exhibits

that document plaintiff's medical history during the relevant time period.  Plaintiff's

medical records confirm that on July 16, 2011, plaintiff was seen on emergency sick

call at 12:35 a.m. because he thought he had a stroke.  (Dkt. No. 1-1 at 30).  It appears

that plaintiff was scheduled to be seen by Dr. Silverberg on September 14, 2011.

(Dkt. No. 1-1 at 31).  According to plaintiff, he did not receive callouts, and then Dr.

Silverberg refused to see him after he waited two hours.  Plaintiff claims that Dr.

Silverberg falsified the records to indicate that plaintiff refused to be seen.

The following day, plaintiff was examined by a nurse, had an EKG, and was

scheduled to see the doctor.  (Dkt. No. 1-1 at 32).  Plaintiff saw Dr. Silverberg on

September 30, 2011 and was prescribed medication.  (Dkt. No. 1-1 at 32).  On October

14, 2011, a stress test was performed.  (Dkt. No. 1-1 at 33).  Plaintiff was again seen

---

[4]  The citations to plaintiff's deposition are to the page numbers on the deposition itself
rather than the ECF automatically generated page numbers.

on sick call on November 30th, December 4th, 5th, 6th, 8th, 20th, and 23rd 2011. (Dkt. No. 61-6 at 41, 42, 43). On December 8th, plaintiff was prescribed prilosec for acid reflux. (Dkt. No. 61-6 at 42). Although he was scheduled to see Dr. Silverberg on January 10, 2012, the doctor had to reschedule the appointment, and plaintiff was seen on February 3, 2012.[5] Plaintiff was diagnosed with gastrointestinal distress and prescribed Prilosec. (Dkt. No. 61-6 at 18).

Plaintiff asserts that his medical needs were "serious" under the objective prong of this test, and defendants assume for purposes of their motion that his medical needs were sufficiently serious. The court will therefore assume, without deciding, that the alleged delay in providing treatment to plaintiff could have had sufficiently serious medical consequences to satisfy the objective prong of the Eighth Amendment standards for medical care.[6] The court finds, however, that, based upon the conclusive evidence regarding the course of plaintiff's medical treatment, he cannot establish that the defendants acted with deliberate indifference to his serious medical needs.

---

[5] Plaintiff confirmed at his deposition that the investigative report, (Dkt. No. 61-6 at 18), summarizing these visits with medical staff is correct. (Hill Dep. at 117-18)

[6] The court notes, however, that the alleged delays in plaintiff's treatment during this time period may not rise to the level of a serious deprivation. *See Brown v. White*, 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at *9-10 (N.D.N.Y. Mar. 15, 2010) (inmate who suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness during a three-month delay in requested medication and other treatment did not suffer a serious deprivation of medical care); *Evans v. Manos*, 336 F. Supp. 2d at 260 (W.D.N.Y. 2004) (subjective claims of pain, unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet medical need); *Hanrahan v. Menon*, 9:07-CV-610 (FJS/ATB), 2010 WL 6427650, at *8-9 (N.D.N.Y. Dec. 15, 2010) (plaintiff's complaints of primarily subjective mental health symptoms do not rise to the level that would make the two-month delay in plaintiff's medication a serious deprivation (Rep't-Rec.), *adopted*, 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd*, 470 F. App'x 32 (2d Cir. May 18, 2012).

These records reflect that the defendants did not ignore plaintiff's complaints, but provided a consistent course of treatment. The medical staff examined him, and an EKG and a stress test were both performed. Plaintiff's main complaint seems to be that Dr. Silverberg would not see him.[7] (Hill Dep. at 119). Dr. Silverberg was not, however, deliberately indifferent to plaintiff's medical needs. Plaintiff acknowledges in his deposition that when he accused Dr. Silverberg of stating that he would not see plaintiff, Dr. Silverberg denied making that comment and responded that he was not sure why the guards would say that, claiming "they don't like me and they don't like you obviously." (Hill Dep. at 123). Plaintiff further admits that the hospital thought he was in a different cell location than he was. (Hill Dep. at 130-31). It appears that it was not Dr. Silverberg who refused to provide callouts for plaintiff or refused to treat him.[8] (Hill Dep. at 131 (noting that it was the block officers getting in the way of his

---

[7] The court notes that at times, plaintiff appears to be simply disagreeing with the treatment that he was given. *See* Dkt. No. 1 at 8 (explaining that Dr. Silverberg prescribed naproxen "which began to eat through the lining in his stomach[], causing him to throw up all the food he ate, and his stomach[] pain to increase as well as breathing problems." However, plaintiff specifically states that he is "not at all in dispute with the doctor[']s course of treatment. (Dkt. No. 61-3 at 5). Moreover, even if plaintiff was alleging a disagreement with Dr. Silverberg's choice of medication, that would be insufficient to state a constitutional claim. A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)); *Williams v. M.C.C. Institution*, 97 CIV. 5352, 1999 WL 179604, at *7 (S.D.N.Y. Mar. 31, 1999) (even if a prison doctor was negligent in mis-diagnosing plaintiff's toxicity to a prescribed drug and increased the risk of injury to the plaintiff by administering the drug during daytime hours, that does not rise to the level of deliberate indifference), *aff'd*, *Williams v. Cohen*, 101 F. App'x 862 (2d Cir. 2004).

[8] Plaintiff also complained that his records were falsified by Dr. Silverberg to show that he refused treatment on September 14, 2011 even though he never signed a refusal form and

medical treatment)).[9]

Moreover, even if the delay amounted to negligence or malpractice, it would not constitute deliberate indifference. *See, e.g., Estelle v. Gamble*, 429 U.S. at 100-01, 106-07 (inmate who alleged doctors did not credit his repeated assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice). In order to establish "deliberate indifference," plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin v. Goord*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff must show that the defendant acted with the equivalent of subjective recklessness. *Id*. (citing *Farmer*, 511 U.S. at 839-40). Plaintiff has not shown that defendant Silverberg acted with deliberate indifference.

With respect to defendants Lindstrand and Racette, plaintiff contends that defendant Lindstrand turned his grievance into a complaint, and that he would have received treatment sooner if it had been filed as a grievance and that defendant Racette was responsible for referring the grievance to defendant Lindstrand. Defendants Lindstrand and Racette were not, however authorized to provide medical care to inmates. *See, e.g., Hardy v. Diaz*, 9:08-CV-1352 (GLS/ATB), 2010 WL 1633379, at

there is not one in his file. During his deposition he explained that when he asked Dr. Silverberg about the lack of a refusal form and testified that Dr. Silverberg said "I understand that some of these guards . . . don't like certain inmates . . . [t]here's no refusals." (Hill Dep. at 121-22). Again, this does not demonstrate deliberate indifference on the part of Dr. Silverberg.

[9] The court notes that these correctional officers are not identified, and are not named as defendants.

*7-8 (N.D.N.Y. Mar. 30, 2010) ("Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical training and authority to do so.") (Rep't-Rec.), *adopted*, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010) (collecting cases).

## IV.    Due Process - Disciplinary Hearing

### A.    Applicable Law

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") or under similar conditions automatically gives rise to due process protection. *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this Circuit have created guidelines for use by district courts in determining whether a

prisoner's liberty interest was infringed. *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." *Colon v. Howard*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest. However, "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d at 65 (citations omitted).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g.*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise

to the level of a constitutional violation); *Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the same sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin* 953 F.2d 744, 750 (2d Cir. 1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.

## B. Application

Defendant Lapolt sentenced plaintiff to 90 days in keeplock following a Tier III hearing. When considering whether a particular prison disciplinary sentence imposed on an inmate is an "atypical and significant hardship," both the conditions of confinement and their duration must be considered, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999). At his deposition, plaintiff testified that he served 90 days in keeplock, which is "the same thing as SHU . . . [except that] you're allowed more of your personal property than SHU." Plaintiff explained however, that they hear the inmates in SHU "yelling and screaming and hanging up all day and all night." (Hill Dep. at 107, 108).

Restrictive confinements of less than 101 days under normal SHU conditions,

as defined in *Sealey v. Giltner*, 197 F.3d at 589, would not constitute atypical and significant hardships giving rise to a liberty interest protected by due process. *Palmer v. Richards*, 364 F.3d at 65. The conditions of a SHU are "doubtless unpleasant and somewhat more severe than those of general population." *Sealey v. Giltner*, 197 F.3d at 589. The SHU conditions which *Sealey* found not to create a liberty interest over 101 days included solitary confinement for 23 hours per day, one hour of exercise outside of the cell, limited showers per week, and the loss of various privileges. The *Sealey* court found that plaintiff suffered no deprivation of a liberty interest, despite his allegations that the SHU cells were considerably noisier than those in general population, and that "a few times," other prisoners threw feces at him. *Id.* at 581, 589. The conditions which plaintiff alleged he experienced during his disciplinary confinement were not more severe than "normal" SHU conditions as defined by *Sealey*, and did not give rise to a protected liberty interest.[10]

---

[10] *See Smith v. Taylor*, 149 F. App'x 12, 13 (2d Cir. 2005) (the district court correctly granted summary judgment and dismissed Smith's due process claims because Smith failed to offer evidence that his SHU confinement for 45 days involved conditions more onerous than those generally present in the SHU); *Pilgrim v. Bruce*, 9:05-CV-198 (GLS/GHL), 2008 WL 2003792, at *15 (N.D.N.Y. May 7, 2008) (plaintiff's conclusory allegations, which notably do not include claims that he was denied food, clothing, bedding, heat, running water, toiletries, or medicine during his 60 days in keeplock, fail to establish that he was subjected to more severe conditions than in normal restrictive confinement); *Holland v. Goord*, 05-CV-6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (77 days in keeplock during which plaintiff was deprived of TV, phone, packages, and commissary, was unable to go to Muslim services and classes did not create protected liberty interest (citations omitted)). Second Circuit cases that have found a possible liberty interest in SHU confinements of less than 101 days are distinguishable because they involved more substantial evidence that the inmate suffered conditions more severe than "normal" SHU restrictions. *See, e.g., Palmer v. Richards*, 364 F.3d at 66 (77-day SHU confinement could implicate due process rights were plaintiff alleged that he was deprived of his property, personal clothing, grooming equipment, hygienic products, reading and writing materials, communication with his family, personal food and vitamin supplements, and placed in mechanical restraints during escorts); *Welch v. Bartlett*, 196 F.3d 389, 393-94 (2d

Moreover, even if plaintiff had shown a protected liberty interest, he received all the process he was due. Based on the record of the disciplinary hearing, no reasonable fact finder could conclude that plaintiff's due process rights were violated or that the outcome of the proceedings would have been any different if he had additional documents.

### 1. Documents

Plaintiff contends that certain documents from his folder were destroyed and that defendant Lapolt should have done something about this destruction. However, the court finds that, based on the record at the hearing, plaintiff did not suffer any prejudice even if the documents were removed from his folder. The documents at issue appear to be other notes that he wrote, and perhaps a note from defendant Spada responding to plaintiff's request for information about a pen-pal program. These notes were discussed at the hearing, and some read into the record by defendant Lapolt. Having additional notes would not have changed the resulting guilty determination, which was based on plaintiff writing notes to defendant Spada. *See Clark v. Dannheim*, 590 F. Supp. 2d at 429-31 (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases).

---

Cir. 1999) (90-day SHU confinement could implicate due process rights where plaintiff alleged that he received inadequate toilet paper, soap and cleaning supplies, a filthy mattress, and infrequent changes of clothes).

## 2.    Sufficiency of the Evidence

The basis of the misbehavior report was that he plaintiff wrote a note on the bottom of his work for defendant Spada indicating that she should check his folder because there was a note for her there.  Plaintiff acknowledged writing this note to Spada on the bottom of his work.  (Hill Dep. at 36).  He implies, however, that the there was at least one note "similar to that, but not the same, but similar to that" in his folder that was intended for Spada, (Hill Dep. at 45), but that the specific note that she found was not directed to her.  (Hill Dep. at 45).  It is clear though, that he wrote a note suggesting that she look in his folder, and that the note she found was indeed in his folder and was not addressed to anyone else.  Spada testified that the note concerned her because she "didn't know what that was going to lead to."  (Dkt. No. 61-6 at 85).

Plaintiff disputed the disciplinary charges because he believed that his actions did not constitute "harassment"or "stalking."  However, plaintiff appears to concede that he inappropriately contacted defendant Spada.  Plaintiff also argues that he should not have been found guilty because Spada previously responded to a note on the bottom of his work where he asked about the availability of a pen-pal program, and that if contact was not allowed, she should have said something at the time.[11]  At the hearing, Spada testified that she responded to the note relating to a pen-pal program on his assignment, stating that she would check about a pen-pal program.  She further

---

[11]  Plaintiff contends that by responding to plaintiff's note, defendant Spada "opened the door" to communication.  (Dkt. No. 1 at 5).

explained that she did not interpret his question to mean that she would be his pen-pal. The characteristic of the request about a pen-pal program, and the note found in his folder are very different. The court finds that although plaintiff made several arguments that he should be found not guilty, "he admitted to engaging in the conduct that formed the basis of the misbehavior report." *Lowrance v. Achtyl*, 20 F.3d 529, 534-35 (2d Cir. 1994).

Plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him and his "defenses" were frivolous. The testimony of defendant Spada and supporting documents provided far more support for defendant Lapolt's guilty finding than required by the "some" "reliable evidence" standard to satisfy due process.

### 3. Hearing Officer Bias

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d at 253, 259 (2d Cir. 1996). An impartial hearing officer is "one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess the evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir. 1990); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo*, 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to

the level of that required of judges generally." *Id.* An inmate's own subjective belief

that the hearing officer was biased is insufficient to create a genuine issue of material

fact. *Francis v. Coughlin*, 891 F.2d at 47; *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432,

437-38 (W.D.N.Y. 2010).

The unsupported allegations that defendant Lapolt was "compromised" because

she knew of plaintiff's grievances (Dkt. No. 61-3 at 6) are insufficient to establish that

she was a biased hearing officer.[12] Additionally, plaintiff's claim that defendant

Lapolt questioned Spada does not demonstrate that she was biased. *See Baxter v.

Palmigiano*, 425 U.S. 308, 322-23 & n.5 (1976) (inmates are not entitled to the right

to confront and cross-examine witnesses at a disciplinary hearing). Given the weight

of the evidence supporting plaintiff's guilt and the fact that defendant Lapolt's rulings

and actions, including seeking documents requested by plaintiff but not previously

provided, clearly comported with due process, no reasonable fact finder could

conclude that she was an unconstitutionally biased hearing officer.

## V.     Interference with Mail

### A.     Applicable Law

Among the protections enjoyed by prison inmates, subject to appropriate

limitations, is the right "to the free flow of incoming and outgoing mail" guaranteed

---

[12]   Plaintiff also argues that defendant Lapolt was not properly designated as a hearing
officer under the applicable rules. This does not state a constitutional violation. *See, e.g.*, *Soto v.
Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise to the level
of a constitutional violation); *Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998)
(violation of state law is not the "benchmark" for determining whether a constitutional violation
has occurred).

by the First Amendment. *Lebron v. Swaitek*, No. 05-CV-172 (GLS/DRH), 2007 WL 3254373, at *6 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.) (citation omitted). "The boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise." *Cancel v. Goord*, No. 00 CIV 2042, 2001 WL 303713 (S.D.N.Y. Mar. 29, 2001). This right, however, must yield to the legitimate penological interests of prison officials when mail is monitored for the purpose of ensuring order in the prison by preventing illegal activities. *Duamutef v. Hollins*, 297 F.3d 108, 112-13 (2d Cir. 2002) (citations omitted).

Actions taken by prison administrators directed toward inmate mail are subject to the overarching consideration that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safley*, 482 U.S. at 89. Applying this precept, "[c]ourts have constitutionally afforded greater protection . . . to outgoing mail than to incoming mail." *Davis*, 320 F.3d at 351 (citations omitted).

B. **Application**

Plaintiff complains that defendant Weatherby improperly made him return packages to the sender at an inflated rate and that defendant Rowe improperly destroyed packages.[13] Plaintiff was told to return these packages because the invoices

---

[13] Plaintiff also appears to argue that defendants Weatherby and Rowe violated his constitutional right to equal protection by taking these actions because they are "racist" and did not treat white inmates the same way. The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473

indicated that he owed shipping charges on them and, in one instance, because he received a package of cigars after already receiving his monthly allowance.  (*See, e.g.,* Dkt. No. 61-6 at 49, 51).  The applicable DOCCS Directives regulate the number of cigars permitted per month and prohibit inmates from ordering items on credit or installment plans.  (*See* Dkt. No. 61-6 at 51 (Superintendent response to grievance, describing Directives 4911 and 4922)).  While plaintiff contends that the company made a mistake by indicating that he owed money on the invoice, the invoice nevertheless showed an outstanding balance.  (*See* Dkt. No. 61-6 at 32 (Grievance 53,448-12, stating "the company had made a typo in placing on the invoice grievant owed $2.00, for shipping"); Dkt. No. 61-6 at 49 (Grievance 52-962-11, stating that "the company sent them and advised the grievant that whenever he make [sic] his next purchase, he is to include $5.00 for the lagged shipping.  Grievant is an [sic] consistent customer with company, and is entitled to such l[en]iency without the guard [sic] determining otherwise.")).  Additionally, the package that was not returned to the

---

U.S. 432, 439 (1985).  "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination."  *Myers v. Barrett*, No. 6:95-CV-1534 (RSP/GJD), 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997).  Under a "class of one" theory, a plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005).  "'Class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'"  *Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). Plaintiff's wholly conclusory allegations regarding the racial motives of defendants fall far short of stating a claim under the Equal Protection Clause.

company was destroyed pursuant to the applicable DOCCS Directive[14] as a result of plaintiff's refusal to complete the required form choosing a disposal method.

There is no basis here for a claim that Defendants violated Plaintiff's right to the free flow of mail. On this record, there is no indication of an invidious intent on defendants' part[15]–all that defendants did was to require plaintiff's compliance with the relevant DOCCS regulations concerning mail, which cannot be said to constitute tampering for purposes of a constitutional claim. *See Nash v. McGinnis*, 585 F. Supp. 2d 455, 463 (W.D.N.Y. 2008) ("'district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face'") citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)). There is nothing in the record to suggest that DOCCS' determinations with respect to these packages were incorrect. However, even if the court were to find that defendants did not properly follow this directive, this alone is insufficient to establish a violation of one's constitutional rights. *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983.")

---

[14] Directive 4911 provides that "[i]f the inmate refuses to complete and sign the Form #2068, no review will be conducted and the item will be disposed of as disallowed property in accordance with Directive #4913." (Dkt. No. 1-1 at 66).

[15] Indeed, plaintiff explicitly discounts any such intent when he states that defendant Weatherby "was continuing to cause [him] to have to return packages for minor reasons that [Weatherby] believed were legitimate." (Hill Dep. at 69).

## VI.    Access to Courts

### A.    Legal Standards

It is well-settled that inmates have a constitutional right to "meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 823 (1977). The Supreme Court held in *Bounds* that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828. The Supreme Court later clarified that "[b]ecause *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey* 518 U.S. 343, 351 (1996). The *Lewis* court explained, "the inmate therefore must go one step further and demonstrate that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." *Id.*

"Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (citing *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995). In addition, "to establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008).

## B.    Application

Plaintiff argues that defendant Racette "knowingly obstructed the processing of particular grievances to prevent exhaustion, and that defendants Lindstrand and Woodworth joined in these actions or deliberately failed to remedy them. (Dkt. No. 61-3 at 10).  More specifically, plaintiff argues that defendant Racette sent a December 6, 2011 grievance regarding inadequate medical care to Lindstrand to address instead of sending it to the grievance office, and that instead of sending it to the grievance office himself, Lindstrand decided the complaint.  (Dkt. No. 61-3 at 10, 11).  Plaintiff further argues that defendant Woodworth took grievances to administrative personnel before sending them to the grievance office.  (Dkt. No. 61-3 at 11).  Finally, plaintiff contends that these defendants prevented grievances from reaching the Central Office Review Committee ("CORC").  (Dkt. No. 61-3 at 16).

Plaintiff was able to bring this lawsuit alleging denial of adequate medical care–and a wide variety of additional claims–therefore, it is clear that any delay or interference with his grievances did not cause an "actual injury."[16]  Plaintiff acknowledged at his deposition that he has not been prevented from filing any lawsuits.  (Hill Dep. at 165).[17]  Moreover, to the extent plaintiff claims that the

---

[16] Plaintiff contends that there are additional grievances that were not processed and that he was prevented from exhausting his administrative remedies with respect to these claims.  It appears, however, that these relate to complaints/grievances submitted after he filed this lawsuit.

[17] Additionally, the court notes that an exception to the exhaustion requirement may apply if defendants prevent a plaintiff from completing the administrative steps required before filing a lawsuit.  Therefore, even if defendants had prevented plaintiff from exhausting his administrative remedies, it would not have precluded his pursuit of this lawsuit.  *See Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (recognizing that an inmate's failure to

grievance process was not properly followed, he states no constitutional violation. It is well-established that prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment. *Rhodes v. Hoy*, No. 9:05-CV-836, 2007 WL 1343649, at *2, *6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi*, No. 01CV0285, 2005 WL 117408, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) (inmate does not have a protected liberty interest in having his grievances investigated at the level of thoroughness that he desires). Accordingly, the court recommends dismissal of plaintiff's claims relating to the processing of his grievances.

## VII. <u>Retaliation</u>

Plaintiff's retaliation claim appears to be based on the contention that nearly all of the above-described actions, and other actions by defendants, were motivated by plaintiff's filing of complaints and grievances–in addition to being stand-alone

---

exhaust may be excused in certain circumstances, including when defendants have waived the defense or "acted in such [a] way as to estop them from raising the defense.") (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)); *see also Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004) (applying the estoppel exception where the plaintiff alleged that prison officials prevented him from exhausting his administrative remedies by threatening him).

violations of his constitutional rights.[18] The court recommends dismissal of plaintiff's

retaliation claims, based on the lack of a causal connection between plaintiff's

protected conduct and any "adverse action" taken against him. Moreover, even if

defendants harbored any retaliatory motives, no reasonable fact finder would conclude

that the defendants would not have taken the same actions absent this retaliatory

motive.

## A. Applicable Law

In order to establish a claim of retaliation for the exercise of a First Amendment

right, plaintiff must show that he engaged in constitutionally protected speech or

conduct, and that the protected activity was a substantial motivating factor for

"adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3ed 133,

137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002)); *see also*

*Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997). The Second Circuit has defined

"adverse action" in the prison context as "retaliatory conduct 'that would deter a

---

[18] Plaintiff also includes a section in his memorandum of law entitled "Failure to Protect." In this section, plaintiff claims that defendants Lapolt, Racette, Murphy, Woodward, Rowe and Lindstrand "failed to properly act to prevent and/or stop retaliative acts and joined in unlawful acts themselves." (Dkt. No. 61-3 at 11). Plaintiff argues that defendants knew of the above-described actions, and failed to take action to remedy the situations. To the extent plaintiff attempts to state a separate claim that defendants violated the Eighth Amendment by "failing to protect" him, his allegations do not state a claim. An inmate has a right to be spared "the 'unnecessary and wanton infliction of pain.'" *Hendricks v. Coughlin*, 942 F.2d 109, 112 (2d Cir. 1991) (citation omitted). In order to state a claim for failure to protect, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and that prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Plaintiff misunderstands the nature of a claim under failure to protect, asserting that defendants failed to protect him from retaliatory conduct. He does not, however, allege any risk of serious harm or "the unnecessary and wanton infliction of pain."

similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a casual connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak*, 380 F.3d 379, 380 (2d Cir. 2004). In evaluating the causal connection element of a retaliation claim, a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff. *Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995). Although a "'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, . . . without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action

would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1997)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion in to matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Smith v. Woods*, 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 & n.11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint 'must, among other things, be based 'on personal knowledge.'" *Id.*, 2006 WL 1133247, at *3 & n.7 (collecting cases); Fed. R. Civ. P. 56(c)(4).

## B. Application

### 1. Denial of Programs[19]

---

[19] The court notes that to avoid dismissal of his due process claims under *Heck v. Humphrey*, 512 U.S. 477 (1944), plaintiff filed a *Peralta* waiver relinquishing any due process claims with respect to his loss of good time. *See Peralta v. Vasquez*, 467 F.3d 98, 105-06 (2d Cir. 2006). However, to the extent plaintiff contends that the denial of entry into these programs to prevent the restoration of good time also violates his due process rights under the Fourteenth Amendment, he fails to state a claim. Plaintiff "does not have a protected liberty interest in participating in rehabilitative programs, or in earning good time credit from such participation."

Plaintiff contends that defendants Lapolt and Murphy denied him entry into the necessary programs to prevent the restoration of good time. (Dkt. No. 61-3 at 9). Aside from plaintiff's conclusory allegation that defendants actions were retaliatory, there is nothing that demonstrates a causal connection between any protected activity and the denial of entry into particular programs. Moreover, defendants explained that he was on a waiting list for the requested programs, but that he would not be placed in the programs until six to eight months before his earliest release date, and that he could not participate in the programs while on keeplock. Consequently, plaintiff would have been denied entry into these programs for reasons other than retaliatory motives.

## 2. False Misbehavior Report

Plaintiff contends that defendant Spada issued him a false misbehavior report in retaliation for plaintiff filing a grievance against defendant Weatherby.[20] He further blames defendant Racette for this misbehavior report, claiming that defendant Racette knew that the misbehavior report was improper and did not do anything about it. As

---

*Barnes v. Abdullah*, No. 11 Civ. 8168, 2013 WL 3816586, at *3 (S.D.N.Y. July 22, 2013) (citing, *inter alia*, *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (finding no due process protection in eligibility for rehabilitative programs in the federal system)); *see also Abed v. Armstrong*, 209 F.3d 63, 66-67 (2d Cir. 2000) (explaining that inmates do not have a liberty interest in "the opportunity to earn good time credit where . . . prison officials have discretion to determine whether an inmate . . . is eligible to earn good time credit."); N.Y. Corr. Law § 803.

[20] The court notes that a prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Therefore, plaintiff cannot state a constitutional claim simply for being given a "false" misbehavior report.

an initial matter, it seems unlikely that defendants would retaliate against an inmate

based on a complaint against other correctional officers in which they were not

implicated.[21]  *See, e.g.*, *Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4

(S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one

defendant's retaliation for complaints against another defendant.") (citing *Wright v.

Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a

corrections officer when only alleged basis for retaliation was complaint about an

incident involving another corrections officer)); *Roseboro v. Gillespie*, 791 F. Supp.

2d 353, 369 (S.D.N.Y. 2011) (plaintiff has failed to provide any basis to believe that a

corrections counselor would retaliate for a grievance that she was not personally

named in).[22]

　　In any event, the court concludes that plaintiff's retaliation claims against

defendant Spada would be subject to dismissal because she would have taken the same

actions with respect to the misbehavior report against plaintiff even if she had known

of complaints or grievances filed by plaintiff.  *See, e.g., Lowrance v. Achtyl*, 20 F.3d

529, 534-35 (2d Cir. 1994) (defendants met their burden of showing that they would

have disciplined the plaintiff even in the absence of the protected conduct because the

---

[21]  Plaintiff argues that defendant Spada let guards "tell her what charges to put against [him]." (Hill Dep. at 35).  However, plaintiff offers no evidence to support this conclusory allegation, and, when testifying at the hearing, defendant Spada testified to no such thing.

[22]  Moreover, to the extent plaintiff believes that a causal connection can be shown simply because the protected activity occurred close in time to the alleged adverse action, the court notes that considering the number of grievances and complaints filed by plaintiff, relying solely on the temporal link between a protected communication and an adverse action to establish causation would make every adverse action by prison officials an act of retaliation.

plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny); *Smith v. Woods*, 2006 WL 1133247, at *10 (the record evidence establishes that the hearing officer could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by plaintiff–*i.e.*, based upon the evidence as presented to him at plaintiff's disciplinary hearing decision).

As explained above in section IV.B.2, plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him. Accordingly, plaintiff cannot state a retaliation claim against defendants Spada and Racette relating to this misbehavior report.

### 3. Hearing

To the extent plaintiff alleges a separate retaliation claim against defendant Lapolt with respect to his disciplinary hearing in addition to the due process claim discussed above, this court recommends dismissal. Plaintiff contends that he had no chance to prevail at the hearing because defendant Lapolt knew of, and had to "deal with" a number of his grievances[23] and complaints and mentioned it to him "off-the-record" at the hearing. (Dkt. No. 61-3 at 6-7; Hill Dep. at 63-66). However, as discussed above, defendant Lapolt's decision at the hearing was based on sufficient evidence. Therefore, even assuming that plaintiff could make out a claim that Lapolt

---

[23] The court notes that prior to the hearing, plaintiff appears to have filed at least two grievances specifically relating to defendant Lapolt's actions. (*See* Dkt. No. 1-1 at 19, Grievance 52,485-11 and Dkt. No. 1-1 at 22, 52,289-11).

harbored a retaliatory motive, the same decision would have been made. Accordingly, plaintiff cannot state a retaliation claim relating to his hearing.

### 4. Medical Care

To the extent plaintiff argues that defendants failed to provide him adequate medical care in retaliation for protected conduct, the court finds that plaintiff cannot demonstrate that defendants took an adverse action against him. As described in detail above in section III.B, plaintiff was treated by medical staff on multiple occasions. Moreover, plaintiff's statements regarding his conversations with Dr. Silverberg demonstrate that Dr. Silverberg did not have any retaliatory intent. *See* section III.B.

### 5. Interference with Packages

Plaintiff asserts that defendants interfered with his packages in retaliation for his grievances. Plaintiff has, however, explicitly admitted that Weatherby had reasons for his actions that he believed to be valid. (Hill Dep. at 69 ("[O]n an ongoing basis [Weatherby] was continuing to cause me to have to return packages for minor reasons that he believed were legitimate.")). Moreover, as explained above, defendants followed DOCCS policies and had legitimate reasons to deny these packages.

### 6. Altered Inmate Disbursement Form[24]

Plaintiff alleges, in conclusory fashion that defendant Weatherby altered his

---

[24] The court further notes that to the extent plaintiff attempts to state a separate due process claim with respect to defendant Weatherby's actions altering the amount on this disbursement form, (Dkt. No. 61-3 at 16) he fails to state a claim. Plaintiff does not have a liberty interest with respect to the alteration to his disbursement form.

disbursement form "for plaintiff filing grievances." (Dkt. No. 61-3 at 13). However, it is unclear which grievances plaintiff believes would have caused Weatherby to alter his disbursement form. As noted above, it is unlikely that Weatherby would retaliate against plaintiff for grievances filed against other DOCCS employees. It does not appear that plaintiff filed the grievances relating to the destruction of his packages until after the disbursement form was altered. There is no evidence of protected conduct that would be related to this "adverse action." Additionally, it is unclear that altering the shipping fee from $3.50 to $5.95 could be considered an adverse action "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."

## VIII. Conspiracy

### A.    Applicable Law

In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009). To state a claim for conspiracy under section 1985(3), a plaintiff must allege facts showing (1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States. *Mian v. Donaldson,*

33

*Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087-88 (2d Cir. 1993) (citation omitted). Moreover, "an essential element . . . is a requirement that the alleged discrimination took place because of the individual's race." *Id.* at 1088.

Conclusory allegations, lacking any factual foundation, are insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland* 456 F. App'x 15, 19 (2d Cir. 2011) (citing *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau*, 292 F.3d at 325. A civil rights conspiracy must be proven with specificity, as bare claims of illegal agreement, supported only by allegations of conduct easily explained as individual action, are insufficient. *See Iqbal v. Hasty*, 490 F.3d 143, 177 (2d Cir. 2007)*, rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009); *see also Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999). Therefore, a plaintiff alleging a civil rights conspiracy must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).

### B.    Application

Plaintiff asserts three conspiracies with respect to his treatment: 1) defendants Racette, Lindstrand and Woodworth conspired to deny him access to the courts; 2) defendant Silverberg conspired to deny him adequate medical care; and 3) defendants

Lapolt, Spada, Racette, Lindstrand, Murphy, Weatherby, Rowe, Silverberg and Pearlman all acted in a racist and retaliatory manner to discriminate against plaintiff. (Dkt. No. 61-3 at 14-16).

Plaintiff's conclusory allegations are insufficient to support any of these claimed conspiracies. Additionally, as described above, none of the actions complained of constituted constitutional violations. Moreover, with respect to the conspiracy allegation against Dr. Silverberg, a single defendant cannot act in conspiracy by himself. Accordingly, the court recommends dismissal of plaintiff's conspiracy claims.

## IX.    Deprivation of Interest on Inmate Account

Plaintiff challenges a DOCCS policy that requires an inmate to have an account balance of $100 to receive interest payments. (Hill Dep. at 150).[25] The defendants named in the complaint were not personally involved in developing the policy and, thus, cannot be liable for any constitutional violation involving the policy. In any event, the policy does not appear to violate the Takings Clause or plaintiff's due process rights, and any DOCCS official personally involved in the policy would be protected by qualified immunity.

---

[25] This claim changes throughout the various documents submitted by plaintiff. At times, plaintiff's claim seems to be based on his belief that he is not earning interest on his "gate fee," or that defendants are taking "interest generated from the funds [being held] from plaintiff's account as gate fee." (Dkt. No. 1 at 10). At other times, his complaint seems to be that he is being denied interest on these gate funds and it is only distributed to inmates with over $100 dollars in their accounts. (Dkt. No. 61-1 at ¶ 47). During his deposition, he appeared to agree that he was actually challenging the policy itself. (Hill Dep. at 150, 158).

## A.     Applicable Law–Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.  A supervisory official is personally involved if the supervisor directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition.  *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007).

## B.     Application

DOCCS Directive 2798 establishes the policy relating to inmate accounts.  It requires that each facility shall establish an Inmate's Fund Account where money earned and/or received by inmates will be deposited and apportioned into a checking account and an interest-earning reserve account.  (Dkt. No. 67 at 42 (Directive 2798)).  It further provides that "[i]nterest earned from the reserve account will be paid on a quarterly basis to inmates whose average quarterly account balance exceeds $100."

(*Id.*).  Plaintiff claims that defendant Racette–the facility Superintendent–and defendant Forbes–the institutional steward–violated his constitutional rights by depriving him of interest on his inmate account, pursuant to the DOCCS policy.  Even assuming that plaintiff did not receive interest payments on the funds in his account, there is no indication that either Racette or Forbes had anything to do with developing or promulgating this DOCCS regulation or had the authority to alter the policy.[26]

Accordingly, they were not personally involved in, and are not liable for, any alleged constitutional violation involving this DOCCS policy.  *See e.g., Hatzfield v. Goord*, No. 04-CV-159, 2007 WL 700961 at *3 (N.D.N.Y. Feb. 28, 2007) (dismissing for lack of personal involvement because, *inter alia*, the Superintendent did not create the challenged DOCCS policy, nor was there any allegation that he had the power to create or terminate the policy); *Hamilton v. Smith*, 9:06-CV-805, 2009 WL 3199520, at *9 (N.D.N.Y. Sept. 30, 2009) (case dismissed against doctor who had no authority to change DOCCS procedures for prescribing special inmate diets).

Plaintiff argues that DOCCS violated the Takings Clause of the Fifth

---

[26] To the extent that plaintiff had suggested that the named defendants took this interest for themselves, he admitted at his deposition that he has no personal knowledge that defendants Forbes and Racette are "personally putting the money in their pocketbook."  (Hill Dep. at 166).  Instead, he argues that the money is being used to benefit "others."  (*Id.*).  In any event, plaintiff may not assert a due process claim based on the suggested embezzlement of this interest by individuals.  *See* Dkt. No. 61-3 at 17.  "[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  New York law provides such a remedy in the form of an action before the New York Court of Claims.  *See* N.Y. Ct. Cl. Act § 9 (McKinney 1989 & Supp. 2005); *Diaz v. Coughlin*, 909 F. Supp. 146, 150 (S.D.N.Y. 1995) (dismissing property deprivation due process claim because inmate could bring action in Court of Claims).

Amendment[27] and his due process rights[28] by refusing to provide him interest on the funds in his inmate account.  As discussed in notes 26 and 27, this court concludes, based on the weight of authority from other circuits that the DOCCS policy does not violate the takings clause or infringe plaintiff's due process rights.  In any event, any defendant personally involved with the challenged DOCCS policy limiting interest to inmate accounts with an average balance of over $100 would be protected by qualified

---

[27] *See* Dkt. No. 61-3 at 18.  The Takings Clause of the Fifth Amendment prohibits the taking of private property for public use without just compensation.  U.S. Const. amend. V.  It is applicable to the States through the Fourteenth Amendment.  *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) ("The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment prohibits the government from taking private property for public use without just compensation.") (citation omitted).  The weight of persuasive authority indicates that the Takings Clause would not be violated by the DOCCS policy requiring an inmate to have an average balance of $100 in his account to receive interest.  *See, e.g.*, *Washlefske v. Winston*, 234 F.3d 179, 183-86 (4th Cir. 2000) (Virginia State Board of Corrections regulation that applies interest earned from $25 prison "hold" accounts for the general benefit of inmates does not violate the Takings Clause because the limited property interest in prison trust accounts did not extend to any interest earned on that account); *Givens v. Alabama Dept of Corrections*, 381 F.3d 1064, 1068-70 (11th Cir. 2004) (Alabama Department of Corrections policy prohibiting inmates from receiving interest on wages deposited in bank accounts was not an unconstitutional taking, in light of fact that no property interest existed); *Young v. Wall*, 642 F.3d 49, 52-53 (1st Cir. 2011) (rejecting argument that denial of interest on prison account constituted an unconstitutional taking of the plaintiff's property).  This court, like the appellate panels in *Washlefske*, 234 F.3d at 186; *Givens*, 381 F.3d at 1068–69; and *Young* rejects the contrary reasoning of the Ninth Circuit in *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1201 (9th Cir. 1998)–the lone Circuit that has held that inmates have property rights in the interest that follows the principal balances in inmate accounts.  *Schneider* erred in "mechanically appl[ying] the mantra that interest follows principal without giving due weight to the truncation of prisoners' property rights that is characteristic of the common law."  *Young*, 642 F.3d at 54.

[28] The authority cited in note 26 above, establishing that inmates do not have property rights in interest earned on prison accounts would also mean that any due process claims relating to withheld interest would not be viable.  *Young v. Wall*, 642 F.3d at 52-53, 55 (because plaintiff has no property interest in interest on his prison account, it follows that he has not been deprived of any due process rights); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (procedural due process imposes constraints on governmental decisions which deprive individuals of "liberty" or "property" interests).

immunity given the lack of definitive law in the Supreme Court and the Second Circuit with respect to the constitutional validity of such a policy.[29]

## X. **Qualified Immunity**

Defendants asserts that they are entitled to qualified immunity in connection with plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory" in all cases). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. This court need not further address qualified immunity with respect to plaintiff's causes of action because, as discussed above, plaintiff has not established any violation of his constitutional rights.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that plaintiff's motion for summary judgment (Dkt. No. 61) be **DENIED**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No.

---

[29] Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990).

64) be **GRANTED** on the grounds stated herein, and that plaintiff's complaint be **DISMISSED** in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 10, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge